STATE, Respondent v. JOHNSTON, Appellant

(200 N.W.2d 238)

(File No. 10943. Opinion filed September 6, 1972)

630

**William R. Rensch,** Rapid City, for defendant and appellant.

**Gordon Mydland,** Atty. Gen., **Frances M. Niemoller,** Asst. Atty. Gen., Pierre, for plaintiff and respondent.

WINANS, Judge.

In an information filed in the circuit court at Rapid City, the defendant, Gary Johnston was charged with obtaining property by false pretenses in violation of SDCL 22-41-4. Following a jury trial, the defendant was found guilty and sentenced to eighteen months in the state penitentiary. The videlicet part of the information particularized the offense in the following language: "That the Defendant, Gary Dwight Johnston, at Rapid City, in said Pennington County, State of South Dakota, on or about the 9th day of February, A.D. 1970, then and there being did then and there, wilfully and unlawfully, feloniously and designedly, by color, aid and use of a false token, to-wit: a manufacturer's statement of origin, obtain property from William Wilder, who relied thereon; said Defendant then and there knowing that he was not entitled to said manufacturer's statement of origin, in violation of SDCL 1967 22-41-4, and .* * *."

Testimony at the trial revealed that the defendant had traded a mini bike to a Bill Wilder in exchange for an older model jeep. In conjunction with the trade, defendant gave Wilder what purport-. ed to be a Manufacturer's Statement of Origin (MSO) for the bike and Wilder's testimony stated that he relied on the MSO as

establishing the defendant's ownership thereof. After Wilder had been in possession of the bike for a short period of time, it was discovered that the bike had been stolen from a Rapid City dealer a few months before the trade and the MSO Johnston had given him, although not forged or altered, was for a bike with a different serial number owned by a former employer of the defendant.

After being apprehended, defendant claimed he had purchased the bike approximately a month before the trade with Wilder from a party known to defendant by the name of Bob Lewis, stationed at the local airbase. To support his claim, the defendant produced a notarized bill of sale that he claimed he had received from Bob Lewis. A search for a Bob Lewis was made by the deputy sheriff of Pennington County who testified he found there were two Bob Lewises stationed at the air force base, one of whom was on a temporary change of station and had been gone for several months, being gone on the 3rd day of January, 1970, the date the notary's name appears affixed to the bill of sale. The deputy sheriff interviewed the other Bob Lewis who stated that he did not know the defendant and it also appears that the description defendant gave the deputy sheriff "did not fit this Bob Lewis that I was talking to". Furthermore, the notary who had supposedly notarized the instrument testified that her seal had been stolen prior to the date indicated on the bill of sale and the signature thereon was not her handwriting.

The defendant claims that the MSO was not a false token.

In State v. Ewers, 1969, 1 Or.App. 47, 458 P.2d 708, the Court of Appeals of Oregon, sitting In Banc, held that a valid refund slip used by the defendant to obtain a refund which was on its face what it purported to be was still a false token. The defendant in Ewers impliedly admitted proof of all the elements of the crime except the false token. The court held:

"The refund slip was the form in general used by the store. The initials of the manager were placed thereon by him, and the defendant signed his own name. All of the handwritten information was placed on the refund slip by an employe of the store. If one looked only at

these facts, he would find the refund slip valid. We think, however, there are other essentials to be considered in this case."

Further quoting from the decision:

"The defendant Ewer deceitfully represented that he owned the golf clubs and bag in order to obtain money from the Villa-Mart Discount Department Store. He knowingly supplied the false information which the clerk placed on the refund slip. That statement was false. The refund slip further carried the false implication that defendant owned the golf clubs and bag, and that he was conveying title to them in exchange for title to and possession of the money. A writing which is fictitious in any material way can be a false token or writing. The defendant adopted as his own the refund slip, when he affixed his signature to it. The refund slip was a false token which he intended to, and did, use to perpetrate a fraud."

In Commonwealth v. Beckett, 1905, 119 Ky. 817, 84 S.W. 758, the Court of Appeals said:

"We have no doubt but that the use of a worthless bill, pretending it is valid, and with the intent to defraud, is a false token under the statute."

In that case the defendant, in a horse-swapping transaction, handed the owner of the other horse "a $10 Confederate bill, with the remark, 'Give me $2.50, here is a ten dollar bill.' French, believing it was a bill for $10 of lawful money — its appearance being quite similar to the treasury silver certificates for that sum — gave appellee the $2.50, and accepted the Confederate bill as good money, without knowledge or suggestion that it was what it was." The Kentucky court had no trouble in holding this to be a false token. Our statute, SDCL 22-41-4, in material parts is as follows:

"Every person who designedly, by color or aid of any false token  *  *  *  obtains from any person any money or property  *  *  *  is punishable by  *  *  *." See Peiffer v. People, 1940, 106, Colo. 533, 107 P.2d 799; Hymes v. United States, D.C.Ct.App., 260 A.2d 679.

■ In the last cited case above the court held the unauthorized use of a credit card may be a violation of false pretenses statute provided all the elements of false pretenses are proven. It held further that,

" 'The crime of false pretenses has five elements: false representation, knowledge of falsity, intent to defraud, reliance by the defrauded party, and obtaining something for value.' "

The court in our case instructed on all of these elements and we think the evidence was sufficient to support the verdict.

■ Although the MSO did not contain false statements, the circumstances made the defendant's delivery of the papers a representation that they were for the particular bike he was selling Wilder. Thus, the MSO was fictitious in that it was not what the defendant represented it to be.

■ ■ The defendant further contends that a directed verdict should have been granted since there was no proper showing that Wilder relied upon the MSO as establishing the defendant's ownership of the bike. Mr. Wilder testified that he would not have given his jeep and the title thereto to the defendant had he not received the MSO which he relied on as being the title to the mini bike. This made it at least a question of fact for the jury. It also appears that Wilder relied on several factors in addition to the MSO as establishing defendant's ownership. Reliance solely on the false token by the victim is unnecessary, it being sufficient if the false token is a part of the moving cause and without it the owner would not have parted with his property. State v. Lien, 1947, 72 S.D. 94, 30 N.W.2d 12.

On cross-examination the defendant was asked the following questions:

"Q Now, in so far as this Statement of Origin is concerned, if you didn't feel that this wasn't a true document to transfer ownership of this particular motorcycle, you would have never given it to Mr. Wilder, would you?

A If I hadn't thought it was — was good for the mini bike, no, I wouldn't have.

Q And is that due to the fact, Mr. Johnston, that you are a law abiding citizen?

MR. RENSCH: That is objected to, Your Honor. It is improper cross examination. It is an attempt to get matters before this jury that are completely improper.

THE COURT: I think he can answer that.

THE WITNESS: What was the question?

QUESTION BY MR. RUDE:

Q I said is that due to the fact that you are a law abiding citizen?

A Not necessarily a complete law abiding citizen, but I don't like to get into trouble.

Q Well, you have been in trouble before, haven't you?

MR. RENSCH: That is objected to as completely improper. It is improper cross examination. It is an attempt to inject prejudicial matters before this jury.

THE COURT: I will sustain the objection."

■ Somewhat the same type of question was asked in State v. Johnson, 81 S.D. 600, 139 N.W.2d 232, and by this court held not to require reversal. We do not believe that the questions were prejudicial to the defendant. We note that when the prosecuting attorney persisted, the court sustained the objection and this terminated the matter.

The defendant assigns error by the court in an instruction given to the jury concerning the question of intent. The court instructed that an intent to defraud is an intent to deceive another for the purpose of gaining some material advantage over him, or to induce him to part with property or to alter his position to his injury or risk, and to accomplish that purpose by some false statement, false token, false representation of fact, wrongful concealment or suppression of truth or by any other artifice or act fitted to deceive.

It is the defendant's contention that while it was incumbent on the state to prove guilt by means of a false token, the above quoted instruction permitted the jury to find the defendant guilty if the jury found the defendant had intended to deceive by means other than the false token.

The jury had been told in a prior instruction of the essential elements of the offense of obtaining property by false pretenses as charged in the information, and that the state must prove each of the elements beyond a reasonable doubt. One of those elements stated by the court for the jury's guidance was the state must prove beyond a reasonable doubt "That the defendant, by means of a false token or writing, to-wit: a manufacturer's statement of origin of one minibike, represented that he had title to the minibike traded to William Wilder, namely Exhibit 1." Other instructions were of the same general import and required the jury to find intent, if at all, based upon the manufacturer's statement of origin.

■■ It is a basic rule that all the instructions given in a case must be read together and construed as a whole in determining whether prejudice was created by part of the instructions. State v. Watkins, 1971, 85 S.D. 573, 187 N.W.2d 265; State v.

Sturgis, 1929, 54 S.D. 245, 222 N.W. 681. In this case, the instructions as a whole properly informed the jury of the elements of the alleged offense including the necessary intent. Viewing all instructions together, there was a sufficient guide for the proper determination of the case.

Judgment is affirmed.

HANSON, P. J., and BIEGELMEIER and WOLLMAN, JJ., concur.

DOYLE, J., not having been a member of the court at the time of argument, took no part in this decision.